**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | | |
|---|---|---|
| THE MEDICAL ASSURANCE CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:08-CV-00029 JD |
| | ) | |
| ALEXANDER C. MILLER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is Plaintiff's Motion for Summary Judgment [DE 47], filed on

December 3, 2009. Defendants the Indiana Patients Compensation Fund and the Indiana

Department of Insurance responded on August 20, 2010 [DE 67], and Plaintiff replied on

September 17, 2010 [DE 68]. Defendants then filed a surreply on October 22, 2010. [DE 72].

For the following reasons, Plaintiff's motion for summary judgment is GRANTED.

## I. Background

On December 1, 2003, Mary and Nolan Knight ("the Knights") filed a proposed

complaint for medical malpractice with the Indiana Department of Insurance under the

provisions of the Indiana Medical Malpractice Act, against Dr. Alexander C. Miller ("Miller").

[DE 48-1]. Pursuant to the terms of Miller's malpractice insurance policy, Miller's insurer, The

Medical Assurance Company, Inc. ("Medical Assurance"), retained the law firm of Eichhorn &

Eichhorn to defend Miller in the medical review panel proceedings. [DE 49-15]. The parties

agree that Miller participated with counsel throughout the panel review process. [DE 48 at 4;

DE 49-3 at 3, 6-9; DE 67 at 5]. The panel rendered its opinions on October 25, 2005. [DE 49-

20]. On November 18, 2005, the Knights filed a lawsuit against Miller [DE 49-2]. Five days

later, on November 23, 2005, Miller was fired from the Illiana Surgery & Medical Center [DE 49-25; DE 49-26]. Medical Assurance again appointed Eichhorn & Eichhorn to defend Miller in the Knight suit. [DE 49-24].

Miller's malpractice policy includes a cooperation clause, which states, in relevant part,

Each insured shall cooperate with us and, upon our request, assist in m aking settlements, in the conduct of suits, and in enforcing any r ight of contribution or indemnity against any person or organization who m ay be lia ble to such insured because of injury with respect to which insurance is afforded under the policy, and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. . . . If any Insured fails to comply with his obligations under the policy, our obligations to suc h insured under the policy shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

[DE 1-2 at 72].

Miller ceased complying with these obligations in 2006. The parties do not dispute that Miller ceased communicating with his defense counsel at some point in the spring of 2006. [DE 48 at 6; DE 67 at 6-9]. During the summer of 2006, Miller moved to live with his parents at their house in Gary, Indiana. [DE 67-4]. Miller did not contact Eichhorn & Eichhorn to update them on his new address. Also during that summer, Miller reported experiencing severe sinus pain that prevented him from sleeping. *Id.* Miller's sister, Sarita Stevens, noted changes in Miller's behavior during this period, which she attributed to sleep deprivation. *Id.*

On September 18, 2006, Miller's attorneys mailed a letter to his last known address in Merrillville, Indiana, advising him of the need to resume communicating with his counsel and cooperating in his defense of the Knight suit (as well as other suits pending against him). [DE 49-29]. The same day, Miller left an apparent suicide note to his family, stating, "I'm sorry but the sinus symptoms and nasal obstruction became unbeatable. I have been living with these

symptoms since Jan or Feb. of this year and it has become increasingly difficult to function."
[DE 67-4]. Miller did not act upon the note, but disappeared and was found several days later in a rented car with broken windows in Cook County, Illinois. *Id.* Miller's family then brought him back to Gary, Indiana. *Id.* There is no evidence before the Court that Miller was ever examined for, diagnosed with, or treated for any mental illness of any kind.

On October 26, 2006, Medical Assurance hired a trace company to locate Miller and secure his cooperation in the Knight suit. A company agent located Miller at his parents' house, and spoke briefly with Miller by phone. [DE 49-30]. Despite this contact, Miller failed to resume communicating with his attorneys. At some point thereafter, during the fall of 2006, Miller traveled with family members to Memphis, Tennessee for surgery to resolve his sinus problems. [DE 67-4]. The surgery was apparently successful. *Id.* However, Miller then disappeared again and has not been definitively located since. *Id.*; [DE 49-31 at 5].

On April 2, 2007, Medical Assurance mailed a letter to Miller at his parents' house, noting Miller's failure to contact his attorneys or otherwise cooperate in his defense and advising him that these failures were in violation of the cooperation clause in his malpractice policy and were resulting in prejudice to Medical Assurance. [DE 49-32]. On August 10, 2007, the Knights filed a motion to compel Miller's deposition in the Knight suit. [DE 49-35]. On August 17, 2007, Medical Assurance sent Miller another letter at his parents' address informing him that his deposition in the Knight case had been scheduled for August 21, and urging him to cooperate in his own defense. [DE 49-36]. On September 28, 2007, the trial court ordered Miller to submit to a deposition within 60 days, and noted that it would consider sanctions if Miller failed to comply. [DE 49-37]. Miller did not appear for this deposition.

In the fall of 2007, Medical Assurance hired a private investigator to locate Miller. The investigator reported that Miller has been living around the area of Tunica, Mississippi, had been renting hotel rooms and cars, and had been living off the savings he amounted while in private practice. [DE 49-31 at 5]. Upon protestations of Miller's family that Miller would harm himself or flee if contacted, the investigator did not hire an additional investigator in Tunica to track Miller down further. [DE 67-5]. In November 2007, Miller's family formally requested that Medical Assurance's investigator cease contacting them regarding Miller's whereabouts. [DE 49-39].

Based on Miller's failure to comply with discovery, the trial court ultimately entered a default judgment for the Knights on January 25, 2008. [DE 49-40]. On June 17, 2008, the trial court ruled that proximate cause was no longer an issue for trial, and that a trial would be held on the issue of damages only. [DE 49-41].

## II. Discussion

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, No. 4:08-CV-69, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has met this burden, the nonmoving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988). To establish a genuine issue of fact, the nonmoving party must come forward with specific facts showing that there is a genuine issue necessitating trial, not "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *First Nat'l Bank of Cicero v. Lewco Secs. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988).

If the nonmoving party fails to establish the existence of an essential element on which it bears the burden of proof at trial, summary judgment is proper–even mandated. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex*, 477 U.S. at 322-23) (holding that a failure to prove one essential element "necessarily renders all other facts immaterial")). In ruling on a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The Court may only consider admissible evidence in ruling on a motion for summary

judgment. Fed. R. Civ. P. 56(c). But if only portions of an affidavit are inadmissible, "courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." *Hogue v. City of Fort Wayne*, 599 F. Supp. 2d 1009, 1016 (N.D. Ind. 2009).

## B. Policy Coverage

### 1. Relevant Law

"Under Indiana law, the interpretation of an insurance policy presents a question of law to be decided by the court." *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 151 (7th Cir. 1994) (citing *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992)). The insured bears the initial burden of proving coverage under an insurance policy. *Id.* (*citing Southbend Escan Corp. v. Fed. Ins. Co.*, 647 F. Supp. 962, 966 (N.D. Ind. 1986)). If an insurer denies coverage based on an exclusion within a policy, the insurer must establish that the exclusion applies. *Id.* "Generally, in Indiana, contracts for insurance are subject to the same rules of interpretation as are other contracts." *Nat'l Fire and Cas. Co. v. West*, 107 F.3d 531, 535 (7th Cir. 1997) (quoting *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985)).

"Indiana law recognizes the validity of cooperation clauses in insurance policies." *Cincinnati Ins. Co. v. Irvin*, 19 F. Supp. 2d 906, 910 (S.D. Ind. 1998) (citing *Wood v. Allstate Ins. Co.*, 21 F.3d 741, 745 (7th Cir. 1994) ("Where insurance policies contain cooperation clauses, those provisions are valid and enforceable.")). However, in order for a breach of a cooperation clause to relieve an insurance company of liability, the insurance company must prove breach of the clause, as well as "(1) that the company used good faith efforts and diligence to obtain the insured's cooperation; (2) that the insured's breach of the cooperation clause was

intentional and willful; and (3) that the insured's failure to cooperate prejudiced the company in its defense of the insured." *Id.* at 910-11 (citing *Smithers v. Mettert*, 513 N.E.2d 660, 662 (Ind. Ct. App. 1987); *Newport v. MFA Ins. Co.*, 448 N.E.2d 1223, 1229 (Ind. Ct. App. 1983)).

In this case, therefore, to prevail on its failure-to-cooperate claim, Medical Assurance must establish (1) that Miller breached the cooperation clause by willfully failing to cooperate in the defense of the Knight suit; (2) that Medical Assurance used good-faith efforts and diligence in seeking Miller's cooperation; and (3) that Miller's failure to cooperate prejudiced Medical Assurance in its defense of the Knight suit. *Smithers*, 513 N.E.2d at 663. Should Medical Assurance show that there is no genuine question of material fact as to whether it has satisfied these requirements, Medical Assurance is entitled to judgment as a matter of law that it has no duty to defend or indemnify Miller in the underlying malpractice suit.

Medical Assurance provides two examples of Miller's alleged failure to cooperate in the Knight suit; it alleges that Miller disappeared without leaving contact information, and that Miller failed to submit to a court-ordered deposition pursuant to a September 23, 2007 order, which resulted in the Court entering a default judgment against Miller. [DE 48 at 11]. The parties do not dispute that Miller did not cooperate with his attorneys. See [DE 67 at 2, 8-9; DE 67-3 at 16; DE 48 at 6-9; DE 49-29]. The parties also do not dispute the validity of the malpractice policy or its cooperation clause. But Medical Assurance claims that Miller's breach of the cooperation clause absolves Medical Assurance of any duty to defend or indemnify him in connection with the Knight suit. [DE 48 at 11]. Defendants, on the other hand, contend (1) that Miller did not willfully fail to cooperate in the defense of the Knight suit because he was mentally ill, and (2) that Medical Assurance did not use good-faith efforts and diligence in

seeking to obtain his cooperation.  [DE 67 at 2, 14].  The Court considers each issue in turn.

### 2. Miller's Failure to Cooperate Was Intentional and Willful

Plaintiff must first establish that Miller's failure to cooperate was intentional and willful. *Irvin*, 19 F. Supp. 2d at 911; *Smithers*, 513 N.E.2d at 663.  Accordingly, the presence of a valid legal excuse that prevented Miller from forming this intent would require the Court to classify Miller's conduct unintentional.  *See Newport*, 448 N.E.2d at 1229 ("An insurer must establish that the absence of insured was intentional and without legal excuse.") (citations omitted).

### a. Intent to Withhold Cooperation

Courts have held that an individual's flight alone is not enough to establish an intent to withhold cooperation when there is no evidence that the individual had knowledge of a lawsuit. *Irvin*, 19 F. Supp. 2d at 911; *Smithers*, 513 N.E.2d at 663 ("[T]he evidence indicates that when Mettert actually received notification he was cooperative.").  However, when an individual has notice of a lawsuit, an intent to withhold cooperation can be inferred from a pattern of intentional conduct that forecloses the possibility of cooperation.  *See Clemens v. State*, 610 N.E.2d 236, 243 (Ind. 1993) ("[T]he law presumes an individual intends the consequences of his acts.") (quoting *Corbin v. State*, 234 N.E.2d 261, 262 (Ind. 1968)); *Conner v. Citizens' St. R.R. Co.*, 45 N.E. 662, 663 (Ind. 1896) ("As a rule of evidence, the presumption that every person intends the natural and probable consequence of his wrongful or unlawful acts applies as well in civil as in criminal cases[.]") (quoting *Gregory v. Cleveland, Columbus, Cincinnati & Indianapolis R.R. Co.*, 14 N.E. 228, 229 (Ind. 1887)); *Travelers' Protective Ass'n of Am. v. Fawcett*, 104 N.E. 991, 994 (Ind. App. 1914) ("There is a general presumption that a person intends the usual and ordinary consequences of his act."); *see also Driebel v. City of Milwaukee*, 298 F.3d 622, 644

(7th Cir. 2002) ("Under Wisconsin law, an actor is presumed to intend the consequences of his knowingly and voluntarily performed acts."); *Heller Intern. Corp. v. Sharp*, 974 F.2d 850, 858 (7th Cir. 1992) ("The word 'intent' . . . in insurance policies denotes that the actor desires to cause the consequences of his act or believes that the consequences are substantially certain to result from it.") (citing Illinois law).

In this case, uncontroverted evidence indicates that Miller knew of the pending lawsuit, having cooperated in his own defense until the spring of 2006. The parties also do not dispute that Miller stopped communicating with his attorneys, and intentionally left Indiana that fall, without providing updated contact information or otherwise remaining in contact with his attorneys. The evidence presented to the Court indicates that Miller has had no contact with his attorneys to this day. Foreclosing the possibility of cooperation in the defense of the Knight suit is a natural and probable consequence of Miller's refusal to communicate and departure from the state. This fact supports the conclusion that Miller's failure to cooperate was intentional.

### b. Insanity Defense

In an effort to establish that Miller's failure to cooperate was not intentional, Defendants claim a legal excuse–that Miller "suffers from a mental illness that precluded his cooperation." [DE 67 at 3]. In the insurance context, Indiana courts classify the defense that mental illness negates an insured's intent as an "insanity" defense. *See*, *e.g.*, *State Farm Fire and Cas. Co. v. Miles*, 730 F. Supp. 1462, 1468-69; *Wiseman v. Leming*, 574 N.E.2d 327, 329 (Ind. Ct. App. 1991); *West Am. Ins. Co. v. McGhee*, 530 N.E.2d 110, 112 (Ind. Ct. App. 1988).

"Proof of legal insanity, in [the insurance] context, requires some evidence tending to prove that the actor was unable to conform his behavior to societal norms." *McGhee*, 530

N.E.2d at 112. Although Plaintiff bears the burden of proving its coverage exclusion, "it is settled law that a person is presumed sane until proven otherwise." *Id.* (citing *Rush v. McGee*, 36 Ind. 69 (1871)); *accord Wiseman*, 574 N.E.2d at 329. To prevail on their claim, Defendants thus bear the burden of proving Miller's insanity by a preponderance of the evidence. *McGhee*, 530 N.E.2d at 112 (citing *Turner v. Estate of Turner*, 454 N.E.2d 1247 (Ind. Ct. App. 1983); *see also Miles*, 730 F. Supp. at 1468 n.5 (placing burden on party asserting insanity defense to insurance exclusionary clause); *Wiseman*, 574 N.E.2d at 329 (same).

As a threshold matter, the Court seeks to clarify Defendants' burden. Referring to the period in 2006 during which Miller was reportedly suffering from chronic sinus pain and insomnia, Defendants state, "It is Miller's conduct during this period of bizarre behavior upon which Medical Assurance bases its case of failure to cooperate." [DE 67 at 2]. However, to establish a legal excuse to Miller's nonparticipation, Defendants must establish that Miller was legally insane *throughout* the relevant period of his nonparticipation. *See, e.g.*, *Wilcox Mfg. Grp., Inc. v. Mktg. Servs. of Indiana, Inc.*, 832 N.E.2d 559, 562 (Ind. Ct. App. 2005) ("The acts or deeds of a person of unsound mind whose unsoundness of mind has not been judicially ascertained and who is not under guardianship are merely voidable and not absolutely void, and are subject to ratification or disaffirmance on removal of the disability.") (citing *Monnier v. Cent. Greyhound Lines*, 129 N.E.2d 800, 803 (Ind. Ct. App. 1955)); *Scherer v. Scherer*, 405 N.E.2d 40, 47 (Ind. Ct. App. 1980) ("[E]ven assuming arguendo the husband was sufficiently intoxicated at the time he signed the power of attorney to deprive him of the requisite power of understanding, the courts have held such defenses to agreements may be waived and the party estopped by behavior inconsistent with his objections.") (citing *Lewis v. Kerns*, 175 F. Supp.

115, 118 (S.D. Ind. 1959)).  In this case, the relevant period runs through the conclusion of the Knight case, including the fall of 2007–when Miller failed to submit to a court-ordered deposition, ultimately leading to an entry of default judgment against him.  [DE 49-37; DE 49-40].

In support of their claim that Miller lacked mental capacity, Defendants rely upon (1) a psychological autopsy conducted by psychologist Gregory Hale, (2) deposition testimony from John Twohy, Miller's attorney in the Knight suit, and (3) an affidavit from Miller's sister, Sarita Stevens.  Defendants assert that these items establish that Miller suffered a "mental breakdown" that precluded his cooperation.  [DE 67 at 7].  Should the Court concur, Miller's failure to cooperate could not be deemed intentional and willful, and the Court would therefore be required to deny judgment as a matter of law.

However, the Court finds that Defendants have failed to meet their burden in this case. Admissible evidence presents an insufficient basis for a reasonable jury to conclude that Miller was legally insane to an extent precluding his cooperation.

*i. Dr. Hale's Affidavit*

In support of their claim that Miller is legally insane to an extent that precludes his cooperation, Defendants offer the affidavit of licensed psychologist Dr. Gregory Hale.  The Court has no doubt that Dr. Hale's education, experience, and training qualify him to offer an opinion as an expert.  *See* Fed. R. Evid. 702.  However, for several reasons, the Court finds that the opinion he offers does not meet the criteria necessary for admission into evidence. Moreover, even if it were admissible, the Court concludes that flaws in Dr. Hale's opinion would entitle it to no weight.

*1. Admissibility*

Any affidavit submitted for the court's consideration in ruling on a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56 (c)(4). "[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'" *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)). "[A]bsent evidence supported by specific facts," conclusory allegations are insufficient to "defeat a motion for summary judgment." *Payne*, 337 F.3d at 773 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Federal Rule of Evidence 702 permits the admission of expert testimony into evidence. That Rule states,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 703 further clarifies that the facts or data that experts rely on in forming such opinions need not be admissible independently, as long as they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]"

However, expert testimony is not automatically admissible as evidence. Indeed, the

Court is under an obligation to review independently the criteria listed in the Federal Rules of Evidence to determine whether expert testimony exhibits indicia of reliability sufficient to warrant its admission as evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596-97 (1993).

For two reasons, Dr. Hale's testimony fails to satisfy the criteria necessary for admission.

### a. Misapplication of Methodology

The Court finds that Dr. Hale improperly used the "psychological autopsy" model to evaluate Miller's sanity. As a result, his opinion is not the product of reliable methodology, and is therefore inadmissible. *See Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004) ("To determine the reliability of an expert's testimony, the Court must consider "whether the reasoning or methodology underlying the testimony is scientifically valid.'") (quoting *Daubert*, 509 U.S. at 592-93). Courts regularly exclude evidence for this reason. For example, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153-54 (1999), the U.S. Supreme Court upheld the district court's exclusion of expert testimony on the ground that the expert misapplied a generally accepted methodology. The Court thereby approved the district court's assessment of "the reasonableness of using such an approach, along with [the expert]'s particular method of analyzing the data thereby obtained, to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Id.* at 154.

Dr. Hale utilized a method of analysis known as a "psychological autopsy" in forming his conclusions about Miller's sanity. Numerous courts have recognized experts' use of a psychological autopsy to determine an individual's manner of death–typically to determine whether or why an individual committed suicide. *See Blanchard v. Eli Lilly & Co.*, 207 F. Supp.

2d 308, 313 n.2 (D. Vt. 2002) ("The psychological autopsy is a generally accepted methodology for trying to determine what led to a suicide."); *see also In re Neurontin Mktg.*, No. 04-CV-10981, 2009 WL 3756328, at *6 (D. Mass. Aug. 14, 2009) (collecting cases discussing use of psychological autopsy to determine cause of suicide).

Although a psychological autopsy may be an accepted methodology to determine the cause of a suicide, Defendants have proffered no evidence that would allow the Court to conclude that it is properly applied to evaluate a living individual's sanity. Indeed, two factors strongly suggest that it is not. First, the subject of the analysis, Miller, is apparently alive. This fact naturally reduces the propriety of relying on second-best analytical tools that do not require an in-person examination to determine the individual's sanity.[1]

Second, "[t]he purpose of a psychological autopsy," according to Dr. Hale, "is to clarify the intention of the person who is the focus of the inquiry." [DE 67-6 at 1]. As Hale states in his report, "The purpose of the retrospective analysis is to determine the 'why' of the event, rather than the 'what.'" [DE 67-6 at 10]. But the relevant issue in this case is not Miller's subjective intent in withholding his cooperation, it is whether he was actually legally insane during the relevant period. These differences indicate that Dr. Hale's use of a psychological autopsy–a tool designed to determine a decedent's manner of death–was not proper to determine a living individual's sanity.

### b. Conclusion Unsupported by Data

Additionally, a crucial flaw in Dr. Hale's opinion is that his conclusion does not flow

---

[1] Dr. Hale himself "acknowledged the inherent limitations of conducting any type of retrospective examination[,]" given that he had "never examined Dr. Miller, nor had the opportunity to more directly assess his psychological functioning." [DE 67-6 at 10, 13].

reliably from the data on which he relies. "In addition to the factors set forth in *Daubert*, a court 'may consider whether the witness's conclusion results from an unfounded extrapolation from the data' and may 'look at whether the witness has adequately accounted for alternative explanations for the effect whose cause is at issue.'" *Fanning v. Sitton Motor Lines, Inc.*, No. 08-CV-2464, 2010 WL 4261476, at \*7 (D. Kan. Mar. 10, 2010) (quoting *Rimbert v. Eli Lilly and Co.*, No. CIV-06-0874, 2009 WL 2208570, at \*5 (D. N.M. July 21, 2009) (citing *Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1333 (10th Cir. 2004))). The reliability requirement is not met when the facts relied upon are not sufficient to support the expert's conclusion. *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) ("It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support."); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 159 (3d Cir. 1999) (upholding district court's exclusion of expert's conclusion because it did not "fit" or reliably flow from the expert's data and methodology); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144-45 (1997) ("The studies [on which the expert relied in formulating his opinion] were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them."); *Blanchard*, 207 F. Supp. 2d at 320 ("The problem is that Dr. Maltsberger's conclusion was not adequately supported by the data on which he relied.").

In his report, Dr. Hale cites sleep deprivation as the principle cause of the changes in Miller's behavior. [DE 67-6 at 13]. Hale recounts that "in late 2005 and early 2006, Miller's health issues (i.e. nasal obstruction) and behavioral adjustment seemed to worsen. The health issues reportedly contributed to insomnia resulting in symptoms related to chronic sleep

deprivation." *Id.* at 12. Later in his report, Hale states that changes in Miller's behavior "are at least partially explained by the term effects of chronic sleep deprivation. Additionally, the alterations in his mentation and emotional responses are specific consequences of extended sleep deprivation." *Id.* at 13. Hale concludes, "Simply stated, the pattern of behaviors displayed after 2005 are distinctly different from behaviors he exhibited prior to that time." *Id.*

However these findings do not support the conclusions in Miller's affidavit. The affidavit does not reflect the clearest finding in Hale's report: that sleep deprivation caused Miller's behavior, at least in part. In fact, the affidavit does not mention sleep deprivation at all. *See Rimbert*, 2009 WL 2208570, at *5 (questioning "whether the witness has adequately accounted for alternative explanations for the effect whose cause is at issue"). Instead, the affidavit focuses on the consequences of that sleep deprivation, stating only that "it appears Miller's emotional and cognitive functioning deteriorated and his overall ability to function decreased." [DE 67-6 at 2]. In turn, Defendants cite this deterioration as evidence of insanity. [DE 67 at 13-14] ("Miller's abrupt change in communication can only be explained by his emotional breakdown and decreasing ability to function.").

On the issue of Miller's mental capacity, Dr. Hale's affidavit testimony also differs markedly from the report he relied upon to formulate his conclusions. In his report, Dr. Hale states, "I question whether Miller maintained the mental capacity to provide the assistance he previously provided to his attorney in his defense." [DE 67-6 at 12]. But his affidavit presents this testimony with absolute conviction: "Beginning in 2006, Dr. Miller did not maintain the mental capacity to provide the assistance he previously provided to his attorneys in his defense." [DE 67-6 at 2].

Because Dr. Hale's expert conclusions are not the product of the reliable application of a reliable principles and methods and do not flow from the facts and data on which he relied, the Court finds Dr. Hale's testimony inadmissible as evidence.

*2. Weight*

Additionally, even if Dr. Hale's testimony were admissible into evidence, logical flaws in his testimony would entitle it to no weight.

In ruling on a motion for summary judgment, a court must consider not only the admissibility of evidence, but also its weight. *Vollmert v. Wis. Dept. of Transp.*, 197 F.3d 293, 298 (7th Cir. 1999); *Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997). In the case of expert testimony, affidavits must set forth "a process of reasoning beginning from a firm foundation." *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (citing *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579-80 (11th Cir. 1985)). Accordingly, "not every contention asserted by an expert will suffice to create a genuine issue of material fact to defeat summary judgment. Gratuitous assertions, for example, which are devoid of substantive explanation and analysis, need not be credited." *Chamberlain Grp., Inc. v. Lear Corp.*, No. 05-CV-3449, 2010 WL 4884448, at *9 (N.D. Ill. Nov. 24, 2010) (citing *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001)). By the same token, "if the factual context renders [the] claim implausible–if the claim is one that simply makes no economic sense–[the parties offering the opinion] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Mid-State*, 877 F.2d at 1339 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In *Weigel*, for example, the Court determined that the expert's opinion was entitled to

no weight on the issue of whether the plaintiff would have been able to return to work if the defendant had accommodated her disability (depression), because the expert psychologist "did not discuss depression in general or [the plaintiff]'s past responsiveness to treatment, and did not attempt to reconcile his opinion with her inability to return to work after an initial five-month leave." *Vollmert*, 197 F.3d at 298 (citing *Weigel*, 122 F.3d at 469).

In this case, Dr. Hale's expert opinion fails to reconcile the apparently successful surgical treatment of Miller's medical condition with his continued failure to participate in Medical Assurance's defense of the Knight suit. The record reflects that in early 2006, Miller began suffering from a severe sinus condition that prevented him from sleeping. [DE 67-4]. But in the fall of 2006, Miller underwent surgery to correct this condition. *Id.* This surgery was successful. *Id.* "[H]owever, shortly after this, he took off again initially to parts unknown." [DE 49-31 at 4]; *accord* [DE 67-4]. Investigators tracked Miller to Tunica, Mississippi [DE 49-31 at 4; DE 67-5], and concluded that Miller had been living off the significant savings he amassed while in private practice. [DE 49-31 at 4-5]. Investigators report no bizarre behavior on Miller's part since his surgery.[2]

After his successful surgery, Miller pursued an extended vacation in Mississippi in lieu of contacting his attorneys and resuming his participation in the defense of the Knight suit against

---

[2] Courts may only consider admissible evidence in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c). Hearsay in private investigators' reports that does not qualify for an exception is properly excluded from consideration. *See Smith v. Lamz*, 321 F.3d 680, 685 (7th Cir. 2003) (unsworn third-party statements quoted in private investigator's report are inadmissible as hearsay); *see also United States v. Wilson*, 281 Fed. Appx. 96, 99 (3d Cir. 2008) (statements to private investigator did not qualify for residual exception to hearsay prohibition). However, the Court rightly considers those statements in an investigator's report that are based on facts within the investigator's personal knowledge. *See Hogue*, 599 F. Supp. 2d at 1016 ("allow[ing] all appropriate recitations of fact to stand").

him.  On August 10, 2007, the Knights filed a motion to compel Miller's deposition in the Knight suit.  [DE 49-35].  On September 28, 2007, the trial court ordered Miller to submit to a deposition within 60 days.  [DE 49-37].  Miller did not appear for this deposition, and the trial court entered a default judgment for the Knights.[3]  [DE 49-40].

Dr. Hale had this information available to him in preparing his report and affidavit.  [DE 67-6 at 11].  Despite citing sleep deprivation as the primary cause of Miller's psychological symptoms, Dr. Hale failed to acknowledge that the surgery was a success, and fails to account for Miller's conduct after undergoing surgery: he was living in Mississippi, withdrawing money from his savings accounts, and continuing not to participate in the defense of the Knight suit. Dr. Hale makes no mention of these facts that tend to undermine his blanket opinion that "[b]eginning in 2006, Miller did not maintain the mental capacity to provide the assistance he previously provided to his attorneys in his defense."  [DE 67-6 at 2].  Instead, without citation, his report notes only that "it did not appear that this particular treatment altered the current psychological process and declines in his usual functioning.  It is unclear whether he actually experienced any type of meaningful improvement in his physical condition or a reduction in his other symptoms (i.e., insomnia)."  [DE 67-6 at 12].

Dr. Hale thus fails to address significant evidence pointing to an obvious, alternate explanation for Miller's refusal to participate in the defense of the Knight suit.  If Miller's insomnia caused his symptoms, he had successful surgery to remedy the cause of that insomnia,

---

[3] In so doing, the trial court noted that it had "not been provided sufficient evidence to support the contention that Dr. Miller suffered from a medical or mental condition so as to be a mitigating factor in determining the appropriate sanctions for his failure to submit to deposition." *Miller v. Knight*, 924 N.E.2d 228, 2010 WL 986890 at *2 (Ind. Ct. App. 2010) (unpublished table opinion).

his alleged bizarre behavior ceased, and he maintained the ability to support himself in Mississippi, it does not logically follow that Miller did not maintain the mental capacity to call his lawyers or show up for his deposition. *See*, *e.g.*, *Wilcox*, 832 N.E.2d at 562; *Scherer*, 405 N.E.2d at 47. Because the "factual context renders [Dr. Hale's] claim implausible", *Mid-State*, 877 F.2d at 1339 (quoting *Matsushita*, 475 U.S. at 587), and because Dr. Hale fails to account for significant evidence tending to undermine his conclusion, *Vollmert*, 197 F.3d at 298, the Court concludes that Dr. Hale's opinion is entitled to no weight.

Finally, the Court notes that even if Dr. Hale's testimony were admitted into evidence, his conclusion is not sufficient to create a genuine issue as to whether Miller was insane under relevant law. As noted previously, "Proof of legal insanity, in [the insurance] context, requires some evidence tending to prove that the actor was unable to conform his behavior to societal norms." *McGhee*, 530 N.E.2d at 112. However, Dr. Hale concludes, "it appears that Miller became incapable of recognizing the consequences of his actions" and "was unable to fully appreciate the consequences of his choices or how those choices impacted the legal claims against him." [DE 67-6 at 2]. Dr. Hale nowhere comments on Miller's ability or inability to conform his behavior to societal norms during the relevant period, as is required to establish the defense of insanity. As a result, even if admitted, Dr. Hale's testimony would not create a genuine issue of material fact as to Miller's sanity.

*ii. Defendants' Other Submissions*

Even taken in the light most favorable to Defendants, other evidence before the Court is insufficient to establish by a preponderance of the evidence that Miller "was unable to conform his behavior to societal norms." *McGhee*, 530 N.E.2d at 112.

The deposition of John Twohy, Miller's attorney in the Knight case, does not support the conclusion that Miller was legally insane. Twohy states in his deposition, "I don't think I'm qualified to evaluate someone's mental state." [DE 67-3 at 4]. But later in his deposition he does just that. Attorneys questioned Twohy about a document that supposedly reflects statements a Dr. Coleman allegedly made to Mr. Treasure, an attorney at Eichhorn & Eichhorn, who is said to have recorded those comments in the document. [DE 67-3 at 10-11]. Mr. Twohy was then asked to interpret that written form, which he did, opining that "a person who at one point is an accomplished orthopedic surgeon and then relatively quickly is no longer coming to the office, no longer doing procedures, no longer responding to his professional obligations and is apparently wandering the streets, has suffered some kind of psychological reversal." [DE 67-3 at 11].

For three reasons, this statement does not create a genuine issue of material fact. First, Twohy's testimony is inadmissible as hearsay. Twohy recounts Mr. Treasure's writing about Dr. Coleman's alleged statements for the truth of the matters asserted. Twohy's statement is thus hearsay-within-hearsay not qualifying for any exception, and is therefore inadmissible. *See* Fed. R. Evid. 802. Twohy has no personal knowledge about any statement made by Dr. Coleman, and even if he did, that statement would be inadmissible to prove the truth of the matter asserted (i.e., instances of Miller's observed behavior). Additionally, the fact that Miller's former attorneys argued (or even sincerely believed) that Miller was insane is insufficient to establish that he actually was. Only matters about which Twohy or other attorneys have personal knowledge or which qualify for an exception to the hearsay prohibition are admissible as evidence; rumors they recount are not. *See Payne*, 337 F.3d at 772 (clarifying the requirement of

personal knowledge); Fed. R. Evid. 602 (same); Fed. R. Evid. 802 (excluding hearsay).

Second, as he himself notes, Twohy, a lawyer, is not qualified to offer an expert opinion on an individual's sanity. *See* Fed. R. Evid. 702. Twohy states, "I would have to leave it to those trained in the field of psychiatry to try and diagnose [Miller based on his alleged actions]." [DE 67-3 at 11]. The Court agrees.

Third, other facts before the Court put Miller's abandonment of his medical practice in context. The Knights' medical malpractice suit was filed on November 18, 2005. [DE 49-2]. Five days later, on November 23, Miller was fired from the Illiana Surgery & Medical Center, LLC. [DE 49-25 at 6]. Miller's contract with Illiana included a two-year noncompetition covenant that prohibited him from practicing medicine within a 15-mile radius of his former employer. [DE 49-25 at 22]. Given these factors, Miller's abrupt termination of his practice does not necessarily evidence legal insanity, but does evidence Miller's adherence to the terms of his employment contract.

The affidavit of Miller's sister, Sarita Stevens, is similarly insufficient to establish that Miller was legally insane throughout the period of his absence. Stevens reports that Miller lived with his parents in Gary, Indiana in 2006, and suffered from sinus pain and insomnia during that period. [DE 67-4]. According to the affidavit, these medical conditions led Miller to contemplate suicide in 2006–he left his family a suicide note (blaming his sinus pain for his insomnia), but did not attempt suicide. *Id.* However, Stevens's affidavit also notes that Miller received successful treatment for his medical conditions in the fall of 2006, but did not return to

Indiana or resume participating in the Knight suit thereafter.[4]  *Id.*

Besides these factors, the Court notes no other evidence that would allow it to conclude by a preponderance of the evidence that Miller suffered from legal insanity that precluded his cooperation through the conclusion of the Knight suit.  Notably, there is no evidence that Miller was ever examined for, diagnosed with, or treated for mental health issues.  Moreover, there is no evidence that Miller could not conform his behavior to societal norms during the relevant period.  In fact, there is evidence to the contrary: Miller withdrew money from his savings accounts, rented hotel rooms and cars, and otherwise supported himself in Mississippi.  [DE 49-31].

Based on the evidence before it, the Court cannot conclude by a preponderance of the evidence that Miller suffered from legal insanity that permitted him to take an extended vacation but precluded him from honoring his contractual obligation to aid his attorneys and his legal obligation to appear for a deposition.  As a result, Defendants have failed to raise a genuine issue of material fact as to whether Miller was legally insane and thus precluded from cooperating in the Knight suit.

### 3. Medical Assurance Made a Diligent, Good-Faith Effort to Obtain Miller's Cooperation

There is no genuine question of material fact that Medical Assurance made legally sufficient efforts to obtain Miller's cooperation.

---

[4] The Court notes that Stevens' statement, "Throughout the middle part of 2006, I received reports that Alex had been sleeping in his car at various locations in Gary, Indiana[.]" is inadmissible to prove the truth of the matter asserted because Stevens professes no personal knowledge about the truth of these rumors.  *See Payne*, 337 F.3d at 772 (holding mere rumors inadmissible); Fed. R. Evid. 602 (same); Fed R. Evid. 802 (excluding hearsay); Fed R. Civ. P. 56 (c)(4) (clarifying the requirement of personal knowledge in affidavits).

"When an insurer attempts to show a breach of cooperation clause, it is incumbent upon it to show in what manner the insurer strove to achieve compliance." *Newport*, 448 N.E.2d at 1229. "In other words, the insurer must demonstrate that it exercised good faith and diligence in securing the cooperation of its insured before asserting the defense of non-cooperation." *Gallant Ins. Co. v. Wilkerson*, 720 N.E.2d 1223, 1226 (Ind. Ct. App. 1999). This requirement seeks to vindicate the dual purposes of liability insurance–to indemnify the insured as well as to protect members of the public who might be injured through negligence. *Id.* at 1227 (quoting *Pennsylvania Threshermen & Farmer's Mut. Casualty Ins. Co. v. Owens*, 238 F.2d 549, 550-51 (4th Cir. 1956)).

Although the Court determines whether an insured's efforts were reasonable on a case-by-case basis, examples are useful. In *Potomac Insurance Co. v. Stanley*, the Court found Plaintiff's efforts sufficient, chronicling,

> A total of nine letters were mailed to Stanley, the latest being dated May 8, 1959. Copies of most of these letters were mailed to members of Stanley's family. Stanley moved from Indianapolis to Columbus, Ohio, and, after plaintiff located him there, he moved to Dayton, Ohio. On each occas ion he failed to notify plaintiff of his address. Plaintiff's Indiana Claim s Manager sought to locate Stanley in the latter part of 1957. Upon information that Stanley had left Indianapolis, the claim manager employed the services of the Indianapolis office of Retail Credit Company, Inc., to trace Stanley. Their search, including a broadcast of disappearance on Stanley to Credit Company's 305 offices nationwide, failed to locate Stanley, but did locate Stanley's wife and daughter and sister, all in Ohio. Those persons professed to have no knowledge of St anley's whereabouts. Stanley adm itted that he received correspondence at Indianapolis and at Columbus, Ohio, but simply ignored it. We think it not debatable that due diligence was shown.

281 F.2d 775, 781 (7th Cir. 1960); *see also State Farm Fire & Cas. Co. v. Miller*, 5 Cal. App. 3d 837, 841-42 (Cal. Ct. App. 1970) (insurer exercised due diligence to find army deserter where it employed a private investigator, checked credit sources, communicated with his parents, checked

with the FBI and BMV, but was unable to locate him).  Other courts have found less exhausting standards sufficient to satisfy a plaintiff's obligation.  In *Assurance Co. of Am. v. MDF Framing, Inc.*, No. CV-06-169, 2008 WL 361289 at *4 (D. Or. Feb. 7, 2008), the district court held that sending a series of letters to an insured at his last known address and attempting to contact him by telephone was sufficient, rejecting defendants' arguments that the insurer "should have followed up with relatives and neighbors of [the insured's] registered agent, hired an investigator, or taken other additional steps."  Similarly, in *Peters v. Saulinier*, the Massachusetts Supreme Court found that the insurer exercised due diligence in trying to obtain the insured's cooperation by trying to locate him at his last known address, when even the insured's parents "did not know, or were unwilling to reveal, where their son then was."  222 N.E.2d 871, 874 (Mass. 1967).

In contrast, the Court in *Pennsylvania Threshermen* held that the insurer's efforts were not reasonable where the insurer only asked the insured's wife and pastor about his whereabouts. 238 F.2d 549, 550 (4th Cir. 1956).  That Court noted that it would not be an "unreasonable burden" for the insurer to inquire at the police, ask around the insured's former place of employment, or contact the post office to see if he had left a forwarding address.  *Id.* at 551. Courts have also held an insurer's burden unsatisfied in cases where there was no evidence that the insured was aware of the suit.  *Irvin*, 19 F. Supp. 2d at 911 (citing *Smithers*, 513 N.E.2d at 663 (insurance company made no effort to contact insured in person or to subpoena or depose him)); *Newport*, 448 N.E.2d at 1229 (finding "no evidence suggesting any effort by [insurer] to keep in contact with [insured] once it was initially informed of the accident").

The facts of this case demonstrate that Medical Assurance did exercise sufficient good

faith and diligence in attempting to secure Miller's cooperation. Miller was obviously aware of the suit, having participated actively until the spring of 2006. After he ceased communicating with his attorneys, Medical Assurance took extensive steps to encourage Miller to resume participating in his defense. Eichhorn & Eichhorn, Miller's counsel in the Knight suit, sent Miller several letters requesting him to resume contact. Medical Assurance hired a trace company to find Miller. A company agent spoke with Miller on the phone. But soon afterwards, Miller disappeared again. Medical Assurance then hired a private investigator. The investigator made the inquiries that the insurer in *Pennsylvania Threshermen* did not, speaking with the police and Miller's former coworkers, and determining that Miller's mail was being forwarded to his parents' house. *See* 238 F.2d at 551. The investigator contacted Miller's parents on several occasions, but they denied knowledge of his whereabouts. Eventually, they requested not to be contacted again regarding Miller's location. [DE 49-39].

Eventually, the investigator determined that Miller was living at an unknown location in or near Tunica, Mississippi. However, there is no evidence before the Court that the investigator (or Medical Assurance) actually identified Miller's residence, or otherwise knew how to get in contact with him. Based on his family's representations that Miller would harm himself or flee if contacted, Medical Assurance did not hire a second investigator in Tunica to pursue Miller further. [DE 49-31 at 5; DE 67-5]. But this fact does not render Medical Assurance's efforts to obtain Miller's participation insufficient under the law. The law does not require an insurer to use any and all means, no matter the cost or consequence, to secure an insured's participation. *See Potomac*, 281 F.2d at 781 (sending letters and contacting family members sufficient); *MDF Framing*, 2008 WL 361289 at *4 (hiring investigator unnecessary). An insured must only

exercise good faith and diligence in an effort to do so. Given Miller's knowledge of the pending suit and Medical Assurance's extensive efforts, the Court concludes that no genuine question on this issue exists.

### 4. Miller's Failure to Cooperate Prejudiced Medical Assurance

The facts of the case also compel the Court to conclude that no genuine question exists as to whether Miller's absence resulted in prejudice to Medical Assurance.

To prevail on a claim of failure to cooperate in Indiana, the insurer must show that it suffered actual prejudice from an insured's absence. Prejudice in Indiana cannot simply be inferred from the insured's absence–a showing of actual prejudice is required. As the Indiana Court of Appeals clarified in *Motorists Mutual Insurance Co. v. Johnson*, "the lack of cooperation . . . must be in some substantial and material respect. Non-cooperation must be material. Prejudice must be shown[.]" 218 N.E.2d 712, 715, 717 (Ind. Ct. App. 1966); *accord Wood*, 21 F.3d at 745 (citing *Motorists*); *Miller v. Dilts*, 463 N.E.2d 257, 261 (Ind. 1984); *Smithers*, 513 N.E.2d at 662. In failure to cooperate cases, the insurer must show that the insured's absence "actually produced a judgment less favorable in the underlying tort action." *Irvin*, 19 F. Supp. 2d at 916 (citing *State Farm Mutual v. Walker*, 382 F.2d at 551; *Wood*, 21 F.3d at 745; *Miller*, 463 N.E.2d at 261; *Smithers*, 513 N.E.2d at 662; *Motorists*, 218 N.E.2d at 715). Additionally, Indiana courts are generally wary of granting summary judgment on the issue of prejudice before the conclusion of the underlying tort suit in light of the Seventh Circuit's holding in *Walker*: that "an insurer is not prejudiced unless the breach will produce a judgment less favorable to it in the tort suit." 382 F.2d at 551. *See*, *e.g.*, *id.* ("This inherent uncertainty has prompted courts to postpone or deny declaratory relief when the underlying tort

action is pending."); *Irvin*, 19 F. Supp. 2d at 916 (no prejudice as a matter of law before conclusion of tort suit where driver of insured's car fled scene after accident and could not been located).

In this case, however, Medical Assurance has demonstrated that it did suffer actual, material prejudice from Miller's absence. In fact, it lost any ability to litigate the now-concluded Knight suit at all. First, Miller's testimony was essential to the defense of the Knight suit. As a medical malpractice action, the Knights were required to prove that Miller committed medical malpractice and that that malpractice was the proximate cause of their injuries. Those determinations centered around Miller's conduct, which could not be determined without his testimony. *See, e.g.*, *Med. Protective Co. v. Bubenik*, No. 4:06-CV-01639, 2008 WL 5070042, at *27 (E.D. Mo. 2008) ("[I]t is clear from the facts of this case that [the defendant's] testimony was, in fact, highly important to the defense of the medical malpractice claim filed against him."), *aff'd* 594 F.3d 1047 (8th Cir. 2010). Second, Miller's failure to appear for his court-ordered deposition led to the entry of default judgment against Medical Assurance, thereby foreclosing trial on the issues of liability and proximate cause and eliminating Medical Assurance's ability to defend the case in any way, including by presenting defenses. *See, e.g.*, *Smith v. Nationwide Mut. Ins. Co.*, 830 A.2d 108, 114 (Vt. 2003) (holding that to constitute prejudice, an insured's noncooperation must have significantly "hindered or precluded the insurer from presenting a credible defense to the underlying claim."); *Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 767 A.2d 831, 844 (Md. 2001) (finding that prejudice resulted when the insured's noncooperation precluded the insurer from offering *any* evidence in defense of the claim). In particular, Medical Assurance could not contest whether Miller's conduct was a

proximate cause of the Knights' injuries. As Medical Assurance points out, it might have done so by submitting into evidence the three certified panel opinions in the Knight case. [DE 48 at 19]; *see also* Ind. Code § 34-18-10-23 (stating that panel opinions are admissible as evidence). Two panel reviewers concluded that Miller's conduct "was not a factor of the resultant damages", and one was unable to determine the issue of proximate cause. [DE 49-20].

Based on these facts, the Court concludes that there exists no genuine question of material fact that Miller's nonparticipation in the defense of the Knight suit, which ultimately led to the grant of default judgement against him, materially prejudiced Medical Assurance.

## Conclusion

Based on the foregoing, Plaintiff's Motion for Summary Judgment [DE 47] is hereby GRANTED. The Court DIRECTS the Clerk to enter judgment in favor of Plaintiff The Medical Assurance Company, Inc. and against Defendants Alexander C. Miller, Mary Knight, Nolan Knight, Indiana Patients Compensation Fund, and Indiana Department of Insurance on Medical Assurance's claim. Medical Assurance shall have no duty to defend Miller in or indemnify Miller for any judgments, damages, costs, or expenses associated with or arising out of the Knight suit. Counter-claimants' claim against Medical Assurance remains pending.

SO ORDERED.

ENTERED: __March 15, 2011__

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court